# In the United States Court of Federal Claims

No. 14-786C

(Filed Under Seal: October 10, 2014)
(Reissued: October 16, 2014)

| | |
|---|---|
| ************************************ ) | Post-award bid protest; challenge to |
| ) | decertification of Service-Disabled |
| **AMBUILD COMPANY, LLC,** ) | Veteran-Owned Small Business for |
| ) | eligibility for an award of a construction |
| **Plaintiff,** ) | contract as to which it was the apparent |
| ) | responsible, responsive lowest-cost |
| **v.** ) | bidder; protestor's lack of opportunity to |
| ) | address issue treated as dispositive by the |
| **UNITED STATES,** ) | agency; procedural due process; 5 U.S.C. |
| ) | § 555; unconditional nature of service- |
| **Defendant.** ) | disabled veteran's majority ownership of |
| ) | the business; prejudice; remedy |
| ************************************ ) | |

Thomas K. O'Gara, Ernstrom & Dreste, LLP, Rochester, New York, New York, for plaintiff.  With him on the briefs was John W. Dreste, Ernstrom & Dreste, LLP, Rochester, New York.

Lauren S. Moore, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant.  With her on the brief were Joyce R. Branda, Acting Assistant Attorney General, Civil Division, Robert E. Kirschman, Director, and Martin F. Hockey, Jr., Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C.  Of counsel was Steven E. Devine, Staff Attorney, United States Department of Veterans Affairs, Office of the General Counsel, Washington, D.C.

## OPINION AND ORDER[1]

LETTOW, Judge.

This post-award bid protest arises out of a dispute emanating from a Service-Disabled Veteran-Owned Small Business ("SDVOSB") set-aside solicitation, issued by the Department of Veterans Affairs ("VA").  Plaintiff, AmBuild Company, LLC ("AmBuild"), was the apparent

---

[1]Because this order might have contained confidential or proprietary information within the meaning of Rule 26(c)(1)(G) of the Rules of the Court of Federal Claims ("RCFC") and the protective order entered in this case, it was initially filed under seal.  The parties were requested to review this order and to provide proposed redactions of any confidential or proprietary information.  No redactions were requested.

responsible, responsive lowest-cost bidder.  The second lowest bidder, Welch Construction, Inc. ("Welch") filed an administrative protest, challenging AmBuild's eligibility as a SDVOSB.  The Small Business Administration ("SBA") rejected those aspects of Welch's protest that were within SBA's purview.  Based on grounds divorced from Welch's protest, however, VA's Center for Verification and Evaluation ("CVE") and then the Executive Director of VA's Office of Small and Disadvantaged Business Utilization ("OSDBU") disqualified AmBuild as a SDVOSB and awarded Welch the contract.  AmBuild challenges that decision on both procedural and substantive grounds, seeking reinstatement as a SDVOSB and award of the contract from which the protest stemmed.

AmBuild has submitted a motion for judgment on the administrative record pursuant to RCFC 52.1(c)(1), and the government has filed a cross-motion for judgment.  The motions have been fully briefed and were addressed at a hearing held on September 26, 2014.  The case is now ready for disposition.

## FACTS[2]

### A.  *AmBuild's Certification as a SDVOSB*

AmBuild is a limited liability company organized under the laws of the State of New York.  Compl. ¶ 1.  AmBuild's majority owner, Mark DeChick, is a service-disabled veteran of the United States Marine Corps, who was honorably discharged after serving in the first Gulf War.  Pl.'s Aff. in Support of Pl.'s Appl. for Inj. Relief ("DeChick Aff.") ¶ 6, ECF No. 4; *see also* Pl.'s Mem. in Support of Pl.'s Mot. for Judgment on the Admin. Record ("Pl.'s Mem.") at 2, ECF No. 16.  Mr. DeChick formed AmBuild in 2011, Compl. ¶ 3, after gaining approximately twenty years of experience as a project manager in the construction industry, DeChick Aff. ¶ 5.  From 2011 to 2014, Mr. DeChick was the sole owner and managing member of AmBuild.  Compl. ¶¶ 3, 7; *see also* AR 28-193 (2011 Operating Agreement, Art. I).[3]  In April 2012, CVE approved AmBuild as a SDVOSB and added the company to the VA VetBiz Vendor Information Pages Verification Program database ("VetBiz VIP database"), rendering it eligible for SDVOSB

___

[2]The recitations that follow constitute findings of fact by the court drawn from the administrative record of the procurement and the parties' evidentiary submissions regarding standing, prejudice, and equitable factors.  *See Bannum, Inc. v. United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005) (bid protest proceedings "provide for trial on a paper record, allowing fact-finding by the trial court").

[3]"AR __" refers to the administrative record filed with the court in accord with RCFC 52.1(a).  The administrative record has been subdivided into tabs.  The first number in a citation to the administrative record refers to a particular tab, and the number after the hyphen refers to the page number of the administrative record, *e.g.*, "AR 28-193" refers to page 193, which is found in tab 28.  The pages of the administrative record are paginated sequentially without regard to the tabs.

set-aside contracts.  After its verification and certification as a SDVOSB, AmBuild proceeded to bid on and win SDVOSB set-aside contracts.  Hr'g Tr. 5:16 to 7:14 (Sept. 26, 2014).[4]

On March 28, 2014, CVE renewed AmBuild's SDVOSB status.  Def.'s Cross-Mot. for Judgment on the Admin. Record & Response to Pl.'s Mot. for Judgment on the Admin. Record ("Def.'s Cross-Mot.") at 4 n.1, ECF No.17.[5]  CVE's renewal of AmBuild's verification as a SDVOSB was supported by its examination of AmBuild's Operating Agreement ("2011 Operating Agreement"), which provided that Mr. DeChick was the sole owner of AmBuild, and by Mr. DeChick's declaration that there had been no amendments to AmBuild's structure or ownership.  *Id.*  Based on CVE's re-verification letter, AmBuild was required to inform CVE of any changes that would affect its SDVOSB status.  *Id.*

Approximately two months after the renewal of AmBuild's verification, on June 3, 2014, Mr. DeChick sold two ten-percent segments of his membership interest in an effort to increase the company's bonding limits.  Compl. ¶ 7.  AmBuild's Vice President, Andrew Claus, and a non-employee insurance agent, Matthew Riedinger, each acquired a ten-percent ownership interest in AmBuild, Compl. ¶ 2, and the Operating Agreement was amended and revised to reflect AmBuild's new ownership structure, AR 38-368 (AmBuild's 2014 Operating Agreement).  After this capital infusion, Mr. DeChick owns 80 percent of the company, remains "the highest-ranking officer in [AmBuild], and maintain[s] 100 [percent] control of the day-to day management and long-term decision making."  DeChick Aff. ¶ 12.

B.  *VA's Solicitation and Action on an Administrative Protest*

On March 26, 2014, VA sought bids under Solicitation No. VA-528-14-B-0132 ("Solicitation"), which involved the renovation of revolving doors at the Veterans Affairs Medical Center located in Syracuse, New York.  AR 9-17 to -59 (Solicitation).  A public bid opening for the Solicitation was subsequently held on June 10, 2014.  AR 10-60 (Pre-Bid Conference Agenda).  AmBuild submitted a bid in response to the Solicitation and was the apparent lowest-cost bidder.  *See* AR 14-90 to -93 (AmBuild's Offer (June 10, 2014)).  Welch was the second lowest bidder.  *See* AR 15-103 to-07 (Welch's Offer (June 10, 2014)).  On June 17, 2014, Welch filed a formal protest with VA's contracting officer for the Solicitation, alleging that Mr. DeChick did not control AmBuild as required by 38 C.F.R. § 74.4(e) and that AmBuild did not meet the size requirements for a SDVOSB.  AR 30-214 to -16 (Welch's Protest).[6]  The

---

[4] The date will be omitted from further citations to the transcript of the hearing conducted on September 26, 2014.
   One of the prior contracts won by AmBuild was subject to an administrative protest based on the contention that it was affiliated with a much larger construction company.  Hr'g Tr. 7:4-10.  That protest was resolved by the Small Business Administration in AmBuild's favor.  *Id.*

[5] CVE's approval of verified status extends for a two-year term.  38 C.F.R. § 74.15(a). Verification may be renewed.

[6] The Veterans Affairs Acquisition Regulation System ("VAAR"), codified at 48 C.F.R. Parts 801-873, permits an offeror to challenge another offeror's SDVOSB status through an agency-level protest.  *See* 48 C.F.R. § 819.307.

protest posited that AmBuild was closely affiliated with and receiving financial assistance from Christa Construction or its owners, evidenced in part by the fact that Mr. DeChick was a previous employee of Christa Construction and by the fact that AmBuild was currently involved in "multi[-]million dollar projects." *Id.*; *see also* AR 30-212 (E-mail from Carly Scott to Dennis Foley, transmitting protest (June 18, 2014)) ("Welch alleges AmBuild is ineligible because AmBuild is affiliated with another business, Christa Construction, and relies on it for the support necessary to bid, bond, manage, and perform projects."). Welch requested that the contracting officer forward the following two protest letters:

> 1. One letter with attachment[s] to the VA OSDBU Office for determination that the SDVOSB is NOT "Controlled by the Owner[;]"

> 2. A second letter with attachment[s] to Small Business Administration to determine (1) size AND (2) if the SDVOSB firm is in violation  of 13 C[.]F[.]R[. § ] 121.103(h)(4)[,] the Ostensible Subcontractor Rule.

AR 30-216.

The protest consequently was forwarded to both SBA and OSDBU. OSDBU gave notice to AmBuild of this protest and requested additional information from AmBuild regarding how it obtained its necessary bonding and whether Mr. DeChick was employed by any other companies. AR 31-244 to -45 (E-mail from VA OSDBU Status Protest to DeChick (June 26, 2014)). That same day, AmBuild responded that its attorney would file a response in "a day or two." AR 31-244 (E-mail from DeChick to VA OSDBU Status Protest (June 26, 2014)). On the following day, AmBuild's counsel sent to SBA and OSDBU the company's response to the allegations of the protest and provided supporting documentation, AR 38-348 (E-mail from Thomas O'Gara to SBA and OSDBU (June 27, 2014)), which included AmBuild's 2014 Operating Agreement indicating the change in the company's ownership structure, *see* AR 38-362 to -85.[7]

SBA reviewed AmBuild's supporting documentation and rejected Welch's contentions that AmBuild did not meet the size standard applicable to the procurement and that AmBuild was affiliated with other firms. AR 32-252 to -54 (SBA Size Determination Mem. (July 11, 2014)). Notably, SBA found "[AmBuild] to be a small business for [its] referenced size

---

[7]In its briefing, the government represented that AmBuild did not submit this documentation to CVE. Def.'s Mot. at 4. This assertion is contradicted by the Record. *See* AR 38-348; *see also* Hr'g Tr. 9:14 to 11:8, 19:24 to 24:18. The court finds that AmBuild, through its attorney, forwarded the requested documentation, including its 2014 Operating Agreement, to both SBA and OSDBU on June 27, 2014.

standard," and concluded that "AmBuild has never subcontracted with or received financial assistance from Christa. . . . There [is] no common ownership or common management." *Id.* [8]

CVE similarly concluded that AmBuild met the size requirement for the applicable procurement and that AmBuild was neither affiliated with nor receiving financial assistance from other firms.  AR 33-256 to -57 (CVE Final Determination (July 21, 2014)).  The grounds for Welch's protest consequently were not accepted.  CVE, however, *sua sponte* initiated consideration of an additional issue related to ownership that was not previously raised by Welch or the contracting officer.  Specifically, upon an examination of AmBuild's 2011 Operating Agreement,[9] CVE determined that Mr. DeChick was not an unconditional owner as required by 38 C.F.R. § 74.3(b) because the "Involuntary Withdrawal" provision of that agreement "include[s] numerous conditions, that are outside of [Mr. DeChick's] control, which would force [Mr. DeChick] to sell his ownership interest to the [c]ompany or remaining [m]embers . . . .  Mr. Claus and Mr. Ried[ing]er[, the two persons who had each acquired a ten percent interest in AmBuild,] would have an opportunity to take possession of [Mr. DeChick's] ownership interest should [Mr. DeChick] be involuntarily withdrawn."  AR 33-258.  AmBuild was never informed that CVE was investigating, *sua sponte*, an additional issue related to Mr. DeChick's ownership.  It learned about CVE's action for the first time when CVE issued its Final Determination that it was sustaining Welch's protest on the previously undisclosed ground.  AR 33-259.  Based on CVE's decision, AmBuild was decertified as a SDVOSB, declared ineligible to receive an award on the Solicitation, and removed from the VetBiz VIP database.  AR 33-259; *see also* Pl.'s Mem. at 4.

On July 28, 2014, AmBuild invoked 48 C.F.R. § 819.307(i) and appealed CVE's Final Determination to the Executive Director of OSDBU.  AmBuild averred that CVE's determination was based on grounds divorced from Welch's protest and respecting which AmBuild had never received notice or been given an opportunity to respond, AR 35-271 to -73 (AmBuild's Appeal (June 28, 2014)).  AmBuild also contended that CVE's reliance on the 2011 Operating Agreement was an error of fact.  AR 35-270.  Finally, AmBuild argued that an "Involuntary Withdrawal" provision in the 2014 Operating Agreement addressed circumstances in which Mr. DeChick might become insolvent, thus triggering provisions comparable in effect to a right-of-first-refusal provision that was held not to condition present ownership in *Miles Construction, LLC v. United States*, 108 Fed. Cl. 792, 803 (2013).  AR 35-275 to -78.

The Executive Director of OSDBU denied AmBuild's appeal on August 7, 2014. AR 36-313 to -18 (Appeal Decision (Aug. 7, 2014)).  The denial acknowledged that CVE's consideration of the ownership issue was "not raised by the contracting officer or [Welch]," but maintained that CVE's self-initiated action was not an error under 48 C.F.R. § 819.307(e).  AR

---

[8] Two years earlier, SBA had rejected a similar protest related to AmBuild.  As SBA stated in rejecting Welch's protest in 2014:  "In 2012, SBA Area office made a size determination of A[m]Build and found the company to be a small business for size standard $33.5 Million."  AR 32-253.

[9] Although AmBuild had supplied its 2014 Operating Agreement by electronic means on June 27, 2014, *see* AR 38-348, -364 to -85, CVE looked to the earlier 2011 Operating Agreement as the basis for its self-initiated inquiry.

36-315.  According to the Executive Director, amendments to 48 C.F.R. § 819.307 adopted on September 30, 2013 "no longer limit[] CVE to resolving only the issues raised by a contracting officer or interested party."  *Id.*  Rather, CVE can determine SDVOSB status based on the "totality of circumstances."  *Id.*  Additionally, although the Executive Director found "CVE's reliance on provisions from an outdated Operating Agreement to be a clear error of fact," he nonetheless concluded that the "Involuntary Withdrawal" provision found in Article I of the 2014 Operating Agreement, broadly defined, creates a "condition subsequent, which could potentially cause [AmBuild's] ownership interest to go to another."  AR 36-315, -17.  The Executive Director specifically noted:

> [S]everal of the events listed in Article [I] are outside [Mr. DeChick's] control, including [Clause iii,] being adjudicated to be bankrupt, [Clause ix,] having to transfer interest through a court order or operation of law, or [Clause v,] the appointment of trustee, receiver, or liquidator for the Member or all or any substantial part of the Member's properties without the Member's agreement or acquiescence.  OSDBU therefore finds the basis for denial in this instance to be legally distinguishable from the right-of-first-refusal provisions addressed in *Miles*.  Accordingly, OSDBU does not conclude that CVE's initial determination regarding unconditional ownership was based upon a clear error of law.

AR 36-317 to -18.  He cited Section 6.3 of the 2014 Operating Agreement, AR 38-379 (providing an optional buy-out in event of an involuntary withdrawal), as forcing Mr. DeChick to "offer to sell his shares should any of the events listed in Article [I] occur." AR 36-317.[10]

## C.  *AmBuild's Protest in this Court*

AmBuild filed suit in this court on August 28, 2014, requesting injunctive relief, contending that VA's decision to disqualify AmBuild as a SDVOSB violated procedural due process and was arbitrary and capricious.  An expedited schedule for submission of the administrative record and for briefing was adopted, providing for completion of briefing on the record within 27 days, and a hearing was held on September 26, 2014, less than a month after the protest was filed.

---

[10]CVE had also concluded that Mr. DeChick did not possess control over AmBuild because Section 5 of its 2011 Operating Agreement required unanimous consent of members for various management activities.  AR 33-258 to -59.  On appeal, the Executive Director of OSDBU overturned CVE's ruling on this ground because the pertinent operating agreement, *i.e.*, the 2014 Operating Agreement, provided that only the Managing Member's approval was needed for management activities.  AR 36-315 to -16, -18.  Because Mr. DeChick served as Managing Member at the time of CVE's Final Determination, the Executive Director found that Mr. DeChick possessed control over AmBuild pursuant to 38 C.F.R. § 74.4(e).  *Id.*

At the close of the hearing, the court stated on the record that a preliminary injunction would be issued later that day. The resulting preliminary injunction (1) set aside the Executive Director of OSDBU's decertification of AmBuild as a SDVOSB, (2) ordered VA to restore AmBuild as an approved and certified SDVOSB and reinstate AmBuild as a SDVOSB in the VetBiz VIP database, and (3) ordered that VA consider any bids or offers that had been or will be submitted by AmBuild, disregarding OSDBU's and CVE's grant of Welch's protest. *See* Order Granting Pl.'s Mot. for Prelim. Inj., ECF No. 19.

## JURISDICTION

The court has jurisdiction over bid protests under the Tucker Act as amended by the Administrative Dispute Resolution Act, Pub. L. No. 104-320, § 12, 110 Stat. 3870, 3874 (Oct. 19, 1996). In pertinent part, the statute provides that

> the United States Court of Federal Claims . . . shall have jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement. . . . [T]he United States Court of Federal Claims . . . shall have jurisdiction to entertain such an action without regard to whether suit is instituted before or after the contract is awarded.

28 U.S.C. § 1491(b)(1); *see Systems Application & Techs., Inc. v. United States*, 691 F.3d 1374, 1380-81 (Fed. Cir. 2012) (*"*On its face, the statute grants jurisdiction over objections to a solicitation, objections to a proposed award, objections to an award, and objections related to a statutory or regulatory violation so long as these objections are in connection with a procurement or proposed procurement.").

AmBuild alleges that VA's application of 48 C.F.R. § 819.307 ("SDVOSB/VOSB Small Business Status Protests") and 38 C.F.R. Part 74 ("Veterans Small Business Regulations") violates due process, the Administrative Procedure Act ("APA"), and VA's own procurement regulations. Section 74.3 of 38 C.F.R. Part 74 recites the standards CVE is to consider in determining Veteran-Owned Small Business ("VOSB") eligibility. Those standards are incorporated into the Veterans Affairs Acquisition Regulation System ("VAAR") provisions set out in 48 C.F.R. § 819.307, which govern SDVOSB and VOSB status protests with OSDBU. AmBuild's alleged violations of the Constitution, statute, and regulations in connection with a procurement fall squarely within the ambit of 28 U.S.C. § 1491(b)(1) and properly invoke this court's bid protest jurisdiction. *See RAMCOR Servs. Grp., Inc. v. United States*, 185 F.3d 1286, 1289 (Fed. Cir. 1999) ("§ 1491(b) . . . does not require an objection to the actual contract procurement. . . . As long as a statute has a connection to a procurement proposal, an alleged violation suffices to supply jurisdiction."); *see also Rothe Dev., Inc. v. United States Dep't of Def.*, 666 F.3d 336, 338 (5th Cir. 2011) ("[T]he Court of Federal Claims now retains exclusive jurisdiction over 'action[s] by an interested party' 'objecting to . . . any alleged violation of statute or regulation in connection with a procurement or a proposed procurement.'" (quoting 28 U.S.C. § 1491(b)(1))); *see also Angelica Textile Servs., Inc. v. United States*, 95 Fed. Cl. 208, 215 (2010), ("The phrase 'in connection with' is very sweeping in scope." (quoting *RAMCOR*

*Servs. Grp.*, 185 F.3d at 1289)), *appeal dismissed*, 462 Fed. Appx. 970 (Fed. Cir. 2012); *cf. SRA Int'l, Inc. v. United States*, __ F.3d __, __, 2014 WL 4494775 (Fed. Cir. 2014) (construing the words "in connection with" in the context of a provision of the Federal Acquisition Streamlining Act, codified at 41 U.S.C. § 4106(f)(1)).

## STANDARDS FOR DECISION

When considering a bid protest, the court adheres to "the standards set forth in section 706 of title 5," *i.e.*, the section of the Administrative Procedure Act ("APA") that prescribes the scope of judicial review of agency actions. 28 U.S.C. § 1491(b)(4). Under the APA, a court may set aside an agency decision if the decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), assuming the criteria for equitable relief are satisfied, *see PGBA, LLC v. United States*, 389 F.3d 1219, 1224-28 (Fed. Cir. 2004).

This court's review is limited to evaluating whether an agency's "decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971), *abrogated in part by Califano v. Sanders*, 430 U.S. 99, 105, (1977) (abrogating *Overton Park* to the extent it recognized the APA as an independent grant of subject matter jurisdiction). In considering an agency's findings, the court "is not empowered to substitute its judgment for that of the agency." *Keeton Corrs., Inc. v. United States*, 59 Fed. Cl. 753, 755 (2004) (quoting *Overton Park*, 401 U.S. at 416). The court may set aside a procurement decision where "(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001). An agency's determination lacks a rational basis if the contracting officer "'failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [the result] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Keeton Corrs.*, 59 Fed. Cl. at 755 (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). A procurement procedure contravenes established law where there is "'a clear and prejudicial violation of applicable statutes or regulations.'" *Impresa Construzioni*, 238 F.3d at 1333 (quoting *Kentron Hawaii, Ltd. v. Warner*, 480 F.2d 1166, 1169 (D.C. Cir. 1973)).

Upon a showing of error, "the court[] may award any relief that the court considers proper, including declaratory and injunctive relief except that any monetary relief shall be limited to bid preparation and proposal costs." 28 U.S.C. § 1491(b)(2) The determination of whether an injunction is appropriate is made by the court after consideration of the factors traditionally applied respecting equitable relief. *See Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009) (citing *PGBA*, 389 F.3d at 1228-29).

## ANALYSIS

### A.  *Statutory and Regulatory Framework*

The procurement at issue is governed by the Veterans Benefits, Health Care, and Information Technology Act of 2006 ("Veterans Benefits Act"), Pub. L. No. 109-461, tit. V, 120 Stat. 3403, 3425 (codified at 38 U.S.C. §§ 8127-28).  The Act provides in pertinent part that "[i]n procuring goods and services pursuant to a contracting preference under this title or any other provision of law," VA "shall give priority to a small business concern owned and controlled by veterans," provided that the business is included in a small business database maintained by VA. 38 U.S.C. § 8128.  To implement this Act, the Veterans First Contracting Program ("Program") was established in 2007, under which VA considers SDVOSB and VOSB entities as first and second priority for procurement awards.

At the Program's commencement, SDVOSB and VOSB entities were permitted to self-certify themselves for registration in the VetBiz VIP database.  Statutory amendments found in 38 U.S.C. §§ 8127(e) and (f) now require the Secretary of VA to maintain the VetBiz VIP database, and the certification process is administered through CVE.  *See* VA Acquisition Regulation: Supporting Veteran-Owned and Service-Disabled Veteran-Owned Small Businesses, 74 Fed. Reg. 64,619-01 (Dec. 8, 2009) (codified at 48 C.F.R. Parts 802, 804, 808, 809, 810, 813, 815, 817, 819 and 852) (effective Jan. 7, 2010); 75 Fed. Reg. 6098-01 (Feb. 8, 2010) (codified at 38 C.F.R. Part 74) (effective Feb. 8, 2010).

Section 74.3 outlines the ownership requirement for a participant to receive verified status by VA, mandating that 51 percent of the entity must be "unconditionally and directly owned by one or more veterans or service-disabled veterans."  38 C.F.R. § 74.3.  Section 74.3 elaborates that

> [o]wnership must not be "subject to conditions precedent, conditions subsequent, executory agreements, voting trusts, restrictions on assignments of voting rights, or other arrangements causing or potentially causing ownership benefits to go to another (other than after death or incapacity).  The pledge or encumbrance of stock or other ownership interest as collateral, including seller-financed transactions, does not affect the unconditional nature of ownership if the terms follow normal commercial practices and the owner retains control absent violations of the terms.

*Id*. § 74.3(b).

Section 74.22 implements procedures to revoke certification of SDVOSB or VOSB status if "CVE believes that a participant's verified status should be cancelled prior to the expiration of its eligibility term."  38 C.F.R. § 74.22(a).  In revocation proceedings, CVE must provide written notice to the participant, which then has thirty days to respond.  *Id*. §§ 74.22(a), (b).  Thereafter, CVE must issue a decision reciting the specific facts and reasoning that formed the basis of its decision.  *Id*. § 74.22(c).  Upon cancellation, the participant can no longer "appear as 'verified'

in the VetBiz VIP database." *Id*. § 74.22(d).  The participant is permitted to administratively appeal a decision by CVE to the Executive Director of OSDBU.  *Id*. § 74.22(e).

An unsuccessful offeror in a procurement under the Veterans First Contracting Program may also file an agency-level bid protest.  Pursuant to the VAAR, "a contracting officer or an interested party may protest the apparently successful offeror's SDVOSB or VOSB status."  48 C.F.R. § 819.307(b).  CVE-approved certifications may be challenged through this route, as provided in 48 C.F.R. § 819.307.  The agency protests "shall be in writing and shall state all specific grounds for the protest.  Assertions that a protested concern is not a SDVOSB or VOSB concern, without setting forth specific facts or allegations, are insufficient."  *Id*. § 819.307(c).  "The Director, CVE, will [then] determine the SDVOSB or VOSB status of the protested concern based upon the totality of circumstances within 21 business days after receipt of the status protest."  *Id*. § 819.307(e).  In these agency-level protests, "SDVOSB and VOSB status shall be determined in accordance with 38 C[.]F[.]R[.] [P]art 74."  *Id*. § 819.307(a).  The regulation provides that "[t]he Director, CVE, *will notify the protestor and the contracting officer* of the date the status protest was received by CVE and whether the status protest will be processed or dismissed for lack of timeliness or specificity."  *Id*. § 819.307(d) (emphasis added).  Notably omitted from the regulation is any requirement that notice be given to the subject of the protest, but due process protections apply in that regard to fill the gap.  *See Miles*, 108 Fed. Cl. at 804 ("An interpretation of 48 C.F.R. § 819.307 . . . that does not allow [for] . . . basic procedural due process is plainly erroneous and cannot be upheld.").

## B. *CVE's and OSDBU's Actions*

AmBuild urges that CVE's final determination and OSDBU's denial of AmBuild's appeal violated procedural due process because both considered issues concerning AmBuild's unconditional ownership that were outside the scope of Welch's protest, and AmBuild was not provided with notice and an opportunity to respond with respect to those issues.  *See* Pl.'s Mem at 8-12.  AmBuild further contends that OSDBU's determination that AmBuild does not satisfy the unconditional ownership requirement for a SDVOSB was based on a clear error of law and constituted arbitrary or capricious agency action that prejudiced AmBuild.  *See id.* at 17-26.

### 1. *Procedural due process.*

AmBuild avers that CVE and OSDBU erred procedurally by *sua sponte* considering Mr. DeChick's unconditional ownership under 38 C.F.R. § 74.3(b) without providing AmBuild notice of the alleged defect or an opportunity to respond.  Pl.'s Mem. at 8-10.

CVE's and OSDBU's determination was an informal agency adjudication,[11] governed by the "minimal [procedural] requirements" set forth in 5 U.S.C. § 555 of the APA.  *Pension Benefit*

---

[11] 5 U.S.C. §§ 551(5) defines rule-making as an "agency process for formulating, amending, or repealing a rule," and Section 551(7) defines adjudication as an "agency process for the formulation of an order."  Formal, as contrasted to informal, adjudicatory procedures are addressed by 5 U.S.C. § 554(a), which "applies . . . in every case of adjudication required by statute to be determined on the record after opportunity for an agency hearing."  No hearing is

*Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 655 (1990); *see also Systems Plus, Inc. v. United States*, 69 Fed. Cl. 757, 767 (2006). Section 555(b) of the APA mandates that a party has a right to be heard in an agency proceeding, absent exigent circumstances:

> A party is entitled to appear in person or by or with counsel or other duly qualified representative in an agency proceeding. So far as the orderly conduct of public business permits, an interested person may appear before an agency or its responsible employees for the presentation, adjustment, or determination of an issue, request, or controversy in a proceeding, whether interlocutory, summary, or otherwise, or in connection with an agency function.

5 U.S.C. § 555(b); *see also Advanced Sys. Tech., Inc. v. United States*, 69 Fed. Cl. 474, 484 (2006) ("[S]ection 555(b) is 'universally understood to establish the right of an interested person to participate in an on-going agency proceeding.'" (quoting *Block v. Securities & Exch. Comm'n*, 50 F.3d 1078, 1085 (D.C. Cir. 1995))).

As a matter of administrative law, the protections afforded by Section 555 of the APA correspond to procedural due process. *See Pension Benefit*, 496 U.S. at 655-56. The requirements of due process rest at the core of our nation's Constitution and governmental institutions and are "ingrained in our national traditions and . . . designed to maintain them." *Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 149, 161 (1951) (Frankfurter, J., concurring). As the Supreme Court said in *Wisconsin v. Constantineau*, 400 U.S. 433, 436 (1971), "[i]t is significant that most of the provisions of the Bill of Rights are procedural, for it is procedure that marks much of the difference between rule by law and rule by fiat." Thus, "[p]rocedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment." *Mathews v. Eldridge,* 424 U.S. 319, 332 (1976). "The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Id.* at 333 (quoting *Armstrong v. Manzo,* 380 U.S. 545, 552 (1965); *see also* Henry J. Friendly, *Some Kind of Hearing,* 123 U. Pa. L.Rev. 1267 (1975). What that means in the realm of administrative law was succinctly described in the Final Report of the Attorney General's Committee on Administrative Procedure in 1941:

> Before adverse action is to be taken by an agency, . . . the individual immediately concerned should be apprised not only of the contemplated action with sufficient precision to permit his preparation to resist, but, before final action, he should be apprised of the evidence and contentions brought forward against him so that he may meet them.

*Joint Anit-Fascist Refugee Committee*, 341 U.S. at 169 n.16 (Frankfurter, J., concurring) (quoting Final Report of the Attorney General's Committee on Administrative Procedure, S. Doc. No. 8, 77th Cong., 1st Sess., at 62 (1941)).

---

required for a protest under 48 C.F.R. § 819.307, so the decisions by CVE and OSDBU on a protest constitute informal adjudications.

In its argument, AmBuild points to this court's decision in *Miles* where OSDBU's failure in an agency protest to notify a veteran about the agency's self-initiated examination into the veteran's unconditional ownership contravened the procedural protections of Section 555 of the APA. Pl.'s Mem. at 8-9 (referring to *Miles*, 108 Fed. Cl. at 803-04). In that case, an administrative protest was filed against an apparently successful veteran offeror on control and ownership grounds because a disappointed bidder believed that the veteran and a non-veteran entity shared common ownership and control. *Id.* at 795-96. OSDBU rejected the grounds of the protest but nonetheless found that the veteran-owned entity did not meet unconditional ownership requirement of 38 C.F.R. § 74.3(b), based on OSDBU's independent inquiry into the veteran-owned entity's Operating Agreement. *Id.* at 796. In describing OSDBU's *sua sponte* consideration of the ownership issue, the court in *Miles* acknowledged that OSDBU has discretion to expand the grounds of a protest beyond those raised by the protestor or the contracting officer, but ruled that the veteran must be given notice of the new inquiry. *Id.* at 804 ("An agency should not act without affording an entity whose award or projected award is protested with notice of an alleged defect and an opportunity to respond."). Referring to *Miles*, AmBuild concedes that "courts have permitted the VA to broaden the scope of a bid protest," but argues that "such an expansion may only be done if the protested [veteran] is given notice and an opportunity to respond." Pl.'s Mem. in Further Support of Pl.'s Mot. for Judgment . . . and in Opp'n to Def.'s Cross-Mot. for Judgment at 4, ECF No. 18.

The government also cites *Miles* as precedent for the proposition that "OSDBU may review and decide status issues in addition to those presented by the protestor and contracting officer." Def.'s Cross-Mot. at 13. But, to support the result in this case, the government relies on post-*Miles* amendments to 48 C.F.R. § 819.307 that require CVE to determine SDVOSB status based on the "totality of the circumstances." *Id.* at 13-14; *see* 48 C.F.R. § 819.307(e) ("The Director, CVE, will determine the SDVOSB or VOSB status of the protested concern based upon the totality of circumstances within 21 business days after receipt of the status protest.").[12] The government relies on that regulatory text to construe the term "totality of circumstances" to expand the grounds on which CVE might act. Def.'s Cross-Mot. at 14.

When interpreting an agency regulation, the rules of statutory construction apply. *Roberto v. Department of Navy*, 440 F.3d 1341, 1350 (Fed. Cir. 2006) (citing *Wronke v. Marsh*, 787 F.2d 1569, 1574 (Fed. Cir. 1986)). Courts are instructed to examine the plain meaning of the statute or rule and "[i]f the words are unambiguous, it is likely that no further inquiry is required." *Meeks v. West*, 216 F.3d 1363, 1366 (Fed. Cir. 2000). If the language is ambiguous, the court will give deference to the controlling agency's interpretation. *Id.*

---

[12]In response to the decision in *Miles*, the VA issued an interim final rule on September 30, 2013, amending 48 C.F.R. § 819.307, to establish an administrative appeal to the Executive Director, OSDBU, from a decision by CVE, and to provide that CVE "will determine the SDVOSB or VOSB status of the protested concern based on the totality of circumstances." 78 Fed. Reg. 59,861-01, 59,865 (Sept. 30, 2013). VA considered that "[a] totality of the circumstances standard is appropriate because, as the integrity of the SDVOSB/VOSB set-aside program is paramount, this permits the Director, CVE, to consider facts or issues not specifically raised by the protesting party that impact the SDVOSB/VOSB status and compliance with 38 C[.]F[.]R[.] Part 74 of the protested party." 78 Fed. Reg. at 59,863.

In this instance, it is well established that the plain meaning of "totality of circumstances" is unambiguous and simply designates a standard of review used in making a legal judgment. *See, e.g.*, *Lough v. Brunswick Corp.*, 103 F.3d 1517, 1519 (Fed. Cir. 1997) (recognizing that "totality of circumstances" language simply conveys "the process by which judges decide legal issues based on various facts that have been determined, utilizing the tools that judges always use, *viz.,* the language of the statute, the purposes of the statute as indicated by legislative history, etc."). The government's strained construction of the amended form of 48 C.F.R. § 819.307 would convert CVE's scope of review into a general license to act on a protest without giving notice of issues not raised by the protesting party or contracting officer but rather generated *sua sponte* by CVE. The requirements of procedural due process cannot be so easily cast aside. VA's amendment of 48 C.F.R. § 819.307 in 2013 will be interpreted to establish a scope of review, but not to abrogate requirements of procedural due process.

During the agency-level protest, AmBuild did not, at a "at a meaningful time and in a meaningful manner," *Mathews*, 424 U.S. at 332, have notice of, or an opportunity to be heard on, issues concerning unconditional ownership. CVE acted *sua sponte* without giving notice to AmBuild that it was entering upon consideration of unconditional ownership. Because that issue was never raised in Welch's protest or by the contracting officer's referral of the protest, AmBuild did not address its ownership structure when it was responding to Welch's protest. Pl.'s Mem. at 10, 13. Indeed, AmBuild was entirely unaware of CVE's self-initiated investigation until its disqualification was rendered in CVE's determination of July 21, 2014. AR 33-255. There is no evidence in the Administrative Record to support OSDBU's assertion that the agency afforded AmBuild any notice, let alone adequate notice, "that it was the subject of a separate [agency-initiated] status protest and [that AmBuild] was given adequate opportunity to respond and submit documentation" based on that protest. AR 36-314 to -15.[13]

The government alternatively advances the argument that notice of CVE's determination and the right to appeal that decision satisfied Section 555 of the APA. Def.'s Mot. at 14-15 ("[T]he decision itself put AmBuild on notice that it did not meet the requirements contained in 38 [C.F.R.] § 74.3(b) with respect to unconditional ownership . . . . AmBuild then had the opportunity to be heard before the agency [on appeal] and to submit documentation into the record with respect to the unconditional ownership issue."). This effort is wholly unconvincing. AmBuild's appeal focused on the fact that CVE evaluated an outdated Operating Agreement, dating to 2011, notwithstanding that AmBuild had provided the current Operating Agreement adopted in 2014, that the 2014 Operating Agreement explicitly provided that "[t]he Company shall be managed by the Managing Member," *i.e.*, Mr. DeChick, and that CVE had improperly concluded that provisions contained in Section 6.3 of AmBuild's Operating Agreement were legally distinguishable from a right-of-first-refusal provision and somehow restricted Mr. DeChick's ownership and control. AR 35-274 to -78 (AmBuild's Appeal); *see also* AR 36-313 (Appeal Decision). On appeal, the Executive Director of OSDBU corrected CVE's improper reliance on an outdated Operating Agreement and found that the current Operating Agreement adequately showed that Mr. DeChick indeed was the Managing Member with control over AmBuild. AR 36-315 to -16. The Executive Director, however, went further to construe

---

[13] AmBuild correctly notes that "[n]otification that a SDVOSB is being challenged based on the SDV's control does not notify the SDVOSB that its ownership is also at issue." Pl.'s Mem. at 14.

provisions of the current Operating Agreement relating to "Involuntary Withdrawal." AR 36-317. The Executive Director pointed to events that included "being adjudicated bankrupt, having to transfer interest through a court order or operation of law, or the appointment of a trustee, receiver, or liquidator for the Member or all or any substantial part of the Member's properties without the Member's agreement or acquiescence." *Id.* On that basis, not previously identified, the Executive Director concluded that AmBuild was not within the unconditional ownership of Mr. DeChick, the disabled-veteran 80-percent owner. AR 36-317 to -18. Consequently, the appeal did not assuage the problem of inadequate procedural due process. *See Rambus Inc. v. Rea*, 731 F.3d 1248, 1255-56 (Fed. Cir. 2013) (noting that "the ultimate criterion [before the court] is whether the appellant has had before the P[atent and ]T[rademark ]O[ffice] a fair opportunity to react to the thrust of the rejection" and refusing to "let the [agency] shortcut this procedure and deprive appellants of their due process rights" (internal quotation and citation omitted)); *see also Miles*, 108 Fed. Cl. at 805 (invalidating OSDBU's decision to disqualify a SDVOSB where "OSDBU did not . . . notify [the plaintiff] about its self-initiated 'unconditional ownership' examination" before rendering a decision); *Systems Plus*, 69 Fed. Cl. at 767 (finding that a "[c]ontracting [o]fficer's decision was procedurally flawed to the point that it was contrary to law" where plaintiff was not notified of the officer's investigation into a new matter until after the disqualification decision was rendered).

In short, terminating AmBuild's SDVOSB status without notifying or giving AmBuild the opportunity to respond to the unconditional ownership issue contravened "the minimal requirements" for an informal adjudication set forth in Section 555 of the APA. *Pension Benefit*, 496 U.S. at 655.

### 2. *Arbitrary and capricious nature of the agency's decision.*

AmBuild further avers that the agency's decision to disqualify AmBuild as a SDVOSB and remove AmBuild from the VetBiz VIP database based on ownership clauses in its 2014 Operating Agreement was arbitrary, capricious, and contrary to law. *See* Pl.'s Mem. at 17-26. A SDVOSB's ownership, as defined in 38 C.F.R. § 74.3(b), must not be subject to "conditions precedent, conditions subsequent, executory agreements, voting trusts, restrictions on assignments of voting rights, or other arrangements causing or potentially causing ownership benefits to go to another (other than after death or incapacity)." These restrictions however, are qualified by inclusion of the proviso that "[t]he pledge or encumbrance of stock or other ownership interest as collateral, including seller-financed transactions, does not affect the unconditional nature of ownership if the terms follow normal commercial practices and the owner retains control absent violations of the terms." *Id.* In short, the regulation sets forth prohibited arrangements that would cause ownership benefits to vest in non-veterans, while accommodating and providing exceptions for normal commercial arrangements.

The Executive Director of OSDBU affirmed CVE's removal of AmBuild from the SDVOSB database on the ground that Article I, Clauses iii, v, and ix, of the 2014 Operating Agreement, relating to bankruptcy, receivership, and transfer by court order or operation of law, permitted sale of Mr. DeChick's 80-percent majority holding of AmBuild. *See* AR 36-315 to -17

(quoted in part *supra*, at 6).[14]  Notably, the government now recasts the basis OSDBU's decision, relying instead on Article I, Clauses iii, vi, and ix, as proof that Mr. DeChick's ownership was "subject to arrangements that could cause or potentially cause his ownership interests to go to another."  Def.'s Cross-Mot. at 19.

The disparity between OSDBU's reliance on Clause v and the government's reliance on Clause vi is of no consequence because neither of those clauses abridges the ownership requirements of 38 C.F.R. § 74.3(b).  Clause v addresses the transfer of ownership property only if that member "seeks, consents to, or acquiesces in the appointment of a trustee . . . [or] receiver."  AR 36-367.  This clause concerns personal insolvency and will be addressed below in connection with Sections iii and ix.  Clause vi recites a "reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief," referring to a corporate entity, AR 38-367, and thus is inapplicable by its terms to Mr. DeChick as an individual.  In short, Clause vi of AmBuild's 2014 Operating Agreement provides no basis for OSDBU's decision.

Clause iii of the 2014 Operating Agreement provides for involuntary withdrawal in the event that "the Member is adjudged bankrupt or insolvent or there is entered against the Member an order for relief in any bankruptcy or insolvency proceeding."  AR 38-365.  The government argues that personal bankruptcy does not ordinarily result in the divesture of ownership, but under the 2014 Operating Agreement, Mr. DeChick would be forced to terminate his ownership shares upon the occurrence of any type of personal bankruptcy.  Def.'s Cross-Mot. at 20.  That argument is inconsistent with Federal bankruptcy law.  The commencement of a bankruptcy case "creates an estate" comprised of the debtor's property.  11 U.S.C. § 541.  And, under New York law, a debtor's property subject to the bankruptcy estate includes his or her ownership rights in a limited liability company.  *See, e.g.*, *In re McCormick*, 381 B.R. 594, 602 (S.D.N.Y. 2008) ("Under New York's Limited Liability Company statute, membership interest in a limited liability company is considered personal property . . . .  Therefore, Debtor's interest in the LLC became property of the estate."); *see also in re Dixie Mgmt. & Inv., Ltd. Partners*, 474 B.R. 698, 701 (W.D. Ark. 2011) ("At the time the debtor filed its bankruptcy petition, it owned a 62 [percent] membership interest in [the LLC]. That interest, and any rights the debtor held under the [Operating Agreement], becomes property of the estate under § 541."); *In re Garrison-*

---

[14]These "Involuntary Withdrawal" provisions of AmBuild's 2014 Operating Agreement appear to be boilerplate clauses taken from statutory default provisions governing LLCs that are found in the laws of many states.  For example, Clauses i through vi of AmBuild's 2014 Operating Agreement mirror the statutory provisions of Section 18-304 of the Delaware Limited Liability Company Act.  *Compare* AR 36-366 to -67 (Clause iv of the 2014 Operating Agreement providing for involuntary withdrawal in the event that "the Member files a petition seeking for the Member any reorganization arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any statute, law, or regulation"), *with* Del. Code Ann. tit. 6, § 18-304(1)(d) (1992) (stating that a "person ceases to be a member of a limited liability company" when that member "[f]iles a petition or answer seeking for the member any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any statute, law or regulation"); *see also* Ga. Code Ann. § 14-11-601.1(4) (1999); Md. Code Ann., Corps. & Ass'ns §§ 4A-606(3)-(5) (2013).

*Ashburn, L.C.*, 253 B.R. 700, 707 (E.D. Va. 2000) ("There is no question that the economic rights, that is the membership interest, becomes property of the estate."). Upon adjudication that the debtor is bankrupt, title to the debtor's property becomes "vested in the trustee . . . with actual or constructive possession, and placed in the custody of the bankruptcy court." *Mueller v. Nugent*, 184 U.S. 1, 14 (1902); *see also Isaacs v. Hobbs Tie & Timber Co.*, 282 U.S. 734, 737 (1931) ("The title and right to possession of all property owned and possessed by the bankrupt vests in the trustee as of the date of the filing of the petition in bankruptcy, no matter whether situated within or without the district in which the court sits."). The trustee, through the bankruptcy court, is empowered to "use, sell, or lease" the debtor's property in the bankruptcy estate. 11 U.S.C. § 363; *see also Irving Trust Co. v. Fleming*, 73 F.2d 423, 426-27 (4th Cir. 1934) ("[I]t is the duty of the trustee, upon his appointment and qualification, to take possession of the property of the bankrupt wherever situate and administer it."). Therefore, regardless of an owner's rights in an Operating Agreement of a limited liability company, an adjudication of bankruptcy causes the court to have power to control the debtor's membership interest. In the event of a personal bankruptcy adjudication, Mr. DeChick would lose control of his membership interest to the bankruptcy court regardless of the language of the 2014 Operating Agreement.[15] Because the property of every business owner is automatically placed in the custody of the court upon bankruptcy, Clause iii of the 2014 Operating Agreement is a standard commercial arrangement in compliance with 38 C.F.R. § 74.3(b).

Clause ix of the 2104 Operating Agreement similarly is permissible under 38 C.F.R. § 74.3(b) because it deals with "normal commercial practices" for doing business. *See Miles*, 108 Fed. Cl. at 803 (holding that a right of first refusal provision in veteran's Operating Agreement providing for the opportunity to purchase a member's shares was not "presently executory," but rather a "standard provision used in normal commercial dealings, and [did] not burden the veteran's ownership interest unless he or she [chose] to sell some of his or her stake"). Clause ix provides for the transfer of ownership "on account of a court order or otherwise by operation of law." AR 38-367. Through a court order or other operation of law mandating the transfer of ownership, Mr. DeChick would be obligated to sell his interest regardless of whether AmBuild's Operating Agreement recited such a requirement. Clause ix describes a circumstance amounting to an "encumbrance of stock or other ownership interest," 38 C.F.R. § 74.3(b), albeit by operation of law, that "does not affect the unconditional nature of ownership" within the meaning of the Section, *id.*

---

[15]The statutory default rule in many states is that the bankruptcy of a member in an LLC results in an involuntary withdrawal. For example, under Delaware statute, "[a] person ceases to be a member of a limited liability company upon the happening of [] the following event[]: . . . [the person i]s adjudged a bankrupt or insolvent, or has entered against the member an order for relief, in any bankruptcy or insolvency proceeding." Del. Code Ann. tit. 6, § 18-304(1)(c) (1992). Correlatively, in New Jersey, "[a] person is dissociated as a member from a limited liability company when . . . [i]n a member-managed limited liability company, the person . . . becomes a debtor in bankruptcy." N. J. Stat. Ann. § 42:2C-46(g) (2014); *see also* Cal. Corp. Code § 17706.02(g) (2014). These statutes demonstrate that loss of membership interest upon adjudication of bankruptcy is a standard consequence for a member of a limited liability company.

Finally, the government intimates that the foregoing clauses create a condition subsequent because, upon the occurrence of any events listed as being an "Involuntary Withdrawal," Article 6.3 of the 2014 Operating Agreement requires Mr. DeChick offer to sell his entire ownership interest to Mr. Claus and Mr. Riedinger.  Def.'s Cross-Mot. at 20-21, 23; *see also* AR 36-317 (reciting the Executive Director of OSDBU's finding that "Section 6.3 forces the [Member] to offer to sell his shares should any of the events listed in Article [I] occur").  Article 6.3 cannot be read in isolation, however, but rather must be interpreted in tandem with the "Involuntary Withdrawal" provisions of the Agreement.  *See Summerfield Hous. Ltd. P'ship v. United States*, 42 Fed. Cl. 160, 166 (1998) ("A court must give reasonable meaning to all parts of the contract 'so as to harmonize and give meaning to all its provisions,' and not render portions of the contract meaningless." (quoting *Arizona v. United States*, 575 F.2d 855, 863 (Ct. Cl. 1978)), *aff'd*, 217 F.3d 860 (Fed. Cir. 1999); *see also Gould, Inc. v. United States*, 935 F.2d 1271, 1274 (Fed. Cir. 1991).  Given that the "Involuntary Withdrawal" clauses do not abridge the ownership requirement under 38 C.F.R. § 74.3(b), it follows that any part of the Agreement describing the process for transferring shares upon an event of involuntary withdrawal also does not create an ownership issue for AmBuild.

In short, the government has neither "'provided a coherent and reasonable explanation of its exercise of discretion'" in decertifying AmBuild, *Impresa Construzioni*, 238 F.3d at 1333 (quoting *Latecoere Int'l, Inc. v. United States Dep't of Navy*, 19 F.3d 1342, 1356 (11th Cir. 1994)), nor articulated a "'rational connection between the facts found and the choice made,'" *Motor Vehicle Mfrs.*, 463 U.S. at 43 (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)).  Accordingly, the court finds that OSDBU's decision to decertify AmBuild and remove it from the VetBiz VIP Database was arbitrary and capricious and not in accord with VA's regulations.

## C.  *Prejudice*

To obtain relief in a bid protest, AmBuild must also demonstrate "both significant error in the procurement process and prejudice to its posture in the process."  *PGBA, LLC v. United States*, 60 Fed. Cl. 196, 203 (2004) (citing *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1057 (Fed. Cir. 2000)), *aff'd*, 389 F.3d 1219 (Fed. Cir. 2004).  In that regard, AmBuild must show that "there was a 'substantial chance' it would have received the contract award but for [CVE's and OSDBU's] errors in the bid process."  *Bannum*, 404 F.3d at 1356 (quoting *Information Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003)).  The facts of record readily demonstrate that AmBuild was substantially prejudiced by CVE's and OSDBU's actions.  The agency addressed issues divorced from Welch's protest without adequately providing AmBuild with notice of, or an opportunity to respond to, the agency-initiated grounds.  Moreover, the agency elided AmBuild from the list of approved SDVOSBs using arbitrary and capricious interpretations of the meaning of "unconditional ownership" in 38 C.F.R. § 74.3(b).  Absent relief, AmBuild will suffer the loss of opportunities to compete for SDVOSB set-aside contracts, a substantial portion of AmBuild's revenue.  AmBuild has been prejudiced by CVE's and OSDBU's actions.

D. *Equitable Relief*

When determining whether to issue a permanent injunction, "the court must consider whether (1) the plaintiff has succeeded on the merits, (2) the plaintiff will suffer irreparable harm if the court withholds injunctive relief, (3) the balance of hardships to the respective parties favors the grant of injunctive relief, and (4) the public interest is served by a grant of injunctive relief." *Centech Grp.*, 554 F.3d at 1037 (citing *PGBA*, 389 F.3d at 1228-29). If all four criteria are satisfied, the court may award declaratory or injunctive relief that is appropriate in the circumstances. *See* 28 U.S.C. § 1491(b)(2).

AmBuild has succeeded on the merits of its protest, and it has suffered irreparable harm by OSDBU's decertification of it as a SDVOSB, disqualifying it from the contractual award under the pertinent solicitation and removing it from the VetBiz VIP database. Balancing the hardships between AmBuild and the government, the court determines that the balance tips in AmBuild's favor. The government has failed to make any showing that an injunction constitutes a hardship for VA. Any possible harm to VA has been forestalled by the accelerated briefing schedule proposed by the parties and adopted by the court, and by the fact that the agency has stayed the contract with Welch. *See* Hr'g Tr. 34:18-20. Considering the severity of the harm AmBuild will suffer without equitable relief, plus its success on the merits, the balance of hardships weighs in favor of granting injunctive relief. Finally, the public has a significant interest in the effective, reliable, and coherent operation of VA's Veterans First Contracting Program, just as it does in preserving the integrity of the competitive SDVOSB procurement process. Those interests are best served by adherence to required procedures and evaluative steps for a procurement. *See Wackenhut Servs. Inc. v. United States*, 85 Fed. Cl. 273, 312 (2008); *PGBA*, 60 Fed. Cl. at 221 ("[T]he public interest is well-served by ensuring that the government procurement process is fair."). The criteria for issuance of equitable relief have been satisfied, and an injunction is appropriate.

## CONCLUSION

For the reasons stated, AmBuild's motion for judgment on the administrative record is GRANTED, and the government's cross-motion for judgment on the administrative record is DENIED. The determination made by OSDBU on August 7, 2014, rendering AmBuild ineligible as a SDVOSB, is set aside. VA shall restore AmBuild as an approved and certified SDVOSB and reinstate AmBuild in the VetBiz VIP database. VA shall consider AmBuild's apparent low bid in response to the Solicitation.[16] The clerk shall enter judgment in accord with this disposition.

AmBuild is awarded its costs of suit.

It is so **ORDERED**.

s/ Charles F. Lettow
Charles F. Lettow
Judge

---

[16]The court declines to direct an award of a contract to AmBuild under the Solicitation.